# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| MARIA GARCIA | ) | |
| SANDRA LOPEZ | ) | 1:21-cv-1011 |
| NORMA SANCHEZ | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. _____ |
| v. | ) | |
| | ) | |
| MIKE MORATH, in his official capacity | ) | |
| as the COMMISSIONER of the TEXAS | ) | |
| EDUCATION AGENCY; and the TEXAS | ) | |
| EDUCATION AGENCY, | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs bring this action for declaratory judgment and respectfully allege as follows:

### INTRODUCTION

1.      Plaintiffs are the Spanish-speaking mothers of children with disabilities attending public schools in Texas.  Each mother is Limited English Proficient (LEP), and their children all attend public school in the state of Texas in school districts subject to the rules and regulations of the Texas Education Agency ("*The Commissioner's Rules*").

2.      Plaintiff Sandra Lopez ("Sra. Lopez") is the mother of H.M., a minor child.  H.M. was diagnosed with Autism Spectrum Disorder ("ASD") when he was three (3) years old and was initially eligible for early childhood special education under the criteria for Non-Categorical Early Childhood—Suspicion of Autism ("AU").  Sra. Lopez speaks little to no English, and her family primarily, usually and almost exclusively speaks Spanish at home.  She knows just enough English to get by at her job in the service industry.  Plaintiff struggled to obtain appropriate special education and related services for her child and to reach agreement regarding H.M.'s eligibility

1

and complete disability profile.  H.M. is now in high school.  On information and belief, Sra. Lopez has been denied adequate language assistance services because she can speak a few words in English, which is all that *The Commissioner's Rules* require.

3.      Plaintiff Norma Sanchez  ("Sra. Sanchez") is the mother of C.S., a minor child.  C.S. is 15 years old and started her first year of high school during the 2021-2022 school year.  C.S. qualifies for special education and related services as a student with AU.  Sra. Sanchez speaks just enough English to navigate her job in a high school cafeteria—she cannot read English beyond a few rudimentary phrases.    Because she was denied appropriate language assistance services, Sra. Sanchez has been unable to effectively advocate for C.S., and she is presently requesting instruction in the home for C.S. because it is no longer safe for the child to attend school at her home campus.  Like Sra. Lopez, Sra. Sanchez has been denied adequate language assistance services because she has the limited language skills she needs to work in a high school cafeteria— beyond that, she does not read or understand written, and much spoken, English.

4.      Plaintiff Maria Garcia ("Sra. Garcia") is the mother of S.A., a minor child.  S.A. is 12 and autistic.  While he is recognized as an English Language Learner ("ELL" – formerly, ESL) who is supposed to be in the school district's bilingual program, S.A.'s classes are typically conducted solely in English, and, because most—if not all—of the information about his program has been provided in English,   Sra. Garcia only recently learned that her son has not been receiving appropriate ESL services in the special education setting. Shockingly, when S.A. was physically abused by school staff just prior to the COVID-19 pandemic, little—if any—documentation of the incident was provided in Spanish.  Desperate and confused, Sra. Garcia asked a friend to help her write a letter requesting to view video of the incident.  Her son's school district wrote her back a letter only in English refusing her access to the video.  Further, her son's school district has

provided IEPs over the years that have been only partially translated into English, if at all. Similarly, "interpreters" at Admission Review and Dismissal Committee ("ARD-c") meetings have routinely misinterpreted and/or mistranslated crucial information. These lax efforts and ineffective language assistance services may very well be excused in Sra. Garcia's case because *The Commissioner's Rules* permit school districts to deny those services if a mother—like Sra. Garcia and the other Plaintiff mothers—is technically *not unable* to speak English, as it were.  Put another way:  unless a parent is *unable to speak English*, she is not entitled to translated IEPs and interpreters at special education meetings whether she actually understands the documents and discussions or not.

5.      In each situation summarized above, the school district failed to provide appropriate translation and interpretation services depriving each mother of the information she needed to make fully informed decisions about, and to meaningfully participate in, the special education process for her child.  However, these failures and deprivations were directly caused *and* permitted by regulations promulgated by TEA and its Commissioner in violation of federal law.

6.      To the point, the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") uses the descriptors "limited English proficient" (LEP) and *native language* to delineate when and how to provide language assistance services to parents like Plaintiff. For LEP parents of students with disabilities, *native language* means "the language normally used by the individual." 20 U.S.C. § 1401(30). Likewise, *native language* is defined as "the language normally[1] used by the parents of the child."   34 C.F.R. § 300.29.

---

[1] Here the adverb 'normally' modifies the word 'used.' The *Cambridge Business English Dictionary* defines the adverb to mean "usually, or in most cases."  Cambridge University Press.  2021.

7.      By contrast, the Texas standard is ambiguously worded to require language assistance services and document translation only if the LEP parent is "*unable to speak* English." Conversely, *if the parent merely speaks English*, she may be denied many or all of those services.

8.      Specifically, pursuant to the recently reauthorized *Commissioner's Rules*[2] at 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i), a school district is obligated to provide some language assistance services to LEP parents of disabled kids *only if* those parents are "unable to speak English."

9.      For example, under the current Texas standard and applying a plain reading of *The Commissioner's Rules*, a school district can decide that an LEP parent of a student with a disability, who merely speaks English **regardless of her level of English proficiency[3] or whether English is primarily or normally used in her home**, is not entitled to the *native language* protections and safeguards guaranteed by IDEA or the language assistance services offered in 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i).

10.     Plaintiffs are seeking—in  a nutshell—a determination via declaratory judgment as to whether the State's regulations related to *if, when and how* LEP parents of students with disabilities receive appropriate language assistance services and properly translated vital documents are preempted by federal regulation.  Plaintiffs are asking this Court to determine which of the following standards should be applied to parents like them and others similarly situated—

---

[2] *The Commissioner's Rules* in Texas, include a section titled *Adaptations for Special Populations*. Within those 'adaptations' at *Division 2: Clarification of Provisions in Federal Regulations and State Law*, The Commissioner's Rules include regulations determining when LEP parents are entitled to translation and interpretation of IEP Team meetings, notices, evaluations, and consent-related documents.

[3] The *Interagency Language Roundtable* (ILR) and the American Council on the Teaching of Foreign Languages (ACTFL) recognize progressive levels of fluency or "proficiency" from "no proficiency – 'non-existent or limited to a few words'" to "limited working proficiency' to "bilingual proficiency." *Please see* https://www.languagetesting.com/ilr-scale.

    a.  The federal *language-normally-used* standard in 20 U.S.C. § 1401(30) and 34 C.F.R. § 300.29, or

    b.  The State's *unable-to-speak-English* standard in 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i).

11.    Adjudicating this matter is crucial. Plaintiffs respectfully submit that LEP parents like them are disproportionately impacted by the ambiguous and arbitrary rules cited *supra*., which weaken federal protections for LEP parents and create confusion for providers.

12.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees that when a state establishes a public school system, no school-age child living in that state may be denied equal access to that education by practice or regulation.

13.    Likewise, no person shall be excluded from participation in, denied the benefits of, or subjected to discrimination by any entity that receives federal financial assistance on the basis of disability or *a relationship or association with an individual with a disability*, like the LEP mothers of disabled students in Texas public schools and the Plaintiffs in this cause. 29 U.S.C. § 794(a) ("Section 504" of the Rehabilitation Act of 1973); 42 U.S.C. § 12132 et seq. ("Americans with Disabilities Act [ADA]"); 28 CFR § 35.130(g)[4].

14.    ADA/504 prohibits rules that 'tend to screen out' a class of individuals with disabilities (or, arguably, those in a relationship or association with an individual with a disability)—

> "A public entity *shall not impose or apply eligibility criteria that screen out or tend to screen out* an individual with a disability or *any class of individuals* with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 CFR § 35.130(b)(8).

---

[4] "(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

In the instant case, *The Commissioner's Rules*, cited *supra*, work to screen out a wide swath of LEP parents from receiving adequate language assistance services because they are "able" to speak English in a rudimentary fashion, though they may be unable to read it or understand it when it is spoken to them.[5]   The Plaintiff mothers are examples of the various ways in which *The Commissioner's Rules* create confusion and stand in the way of the purposes of the *native language* protections for the LEP parents of children with disabilities by screening out only those who are *unable-to-speak-English* regardless of their level of proficiency and the degree to which they are able to provide informed consent in their *native language*.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(3)[6] and 28 U.S.C. §§ 2201–2022.

16.    Because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and continue to occur in this District, venue is proper in the United States District Court for the Western District of Texas.  28 U.S.C. § 1391(b).

17.    Administrative exhaustion of IDEA-related claims through SOAH is typically required. *Frye v. Napoleon*, 137 S.Ct. 743, 197 L. ED 2d 46 (2017).  34 C.F.R. § 300.507; 19 TEX. ADMIN. CODE § 89.1151(a).  *Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d. 108, 112 (5th  Cir. 1992). However, in the instant case and as discussed *infra*., Plaintiffs allege TEA's *systemic* violation of

---

[5] Defendants are excluding, and/or are causing Plaintiffs' school districts to exclude, Plaintiffs from participation in public education, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i).  Moreover, Defendants are using methods of administering and providing language assistance services ("methods of administration") that have the effect of subjecting Plaintiffs to discrimination on the basis of disability in violation of 34 C.F.R. § 104.4(b)(4).

[6] "To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."  *See also* Footnote 7 below.

IDEA and their allegations do not have at their core or "gravamen," as it were, the provision of FAPE to an individual child.[7]

## PARTIES

18.     Plaintiffs (or "Plaintiff mothers"), as described above, are mothers of "child[ren] with a disability" within the meaning of IDEA at 20 U.S.C. § 1402(3)(A), 34 C.F.R. § 300.8; and "qualified individual(s) with a disability" within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. § 705(20); and Title II of the Americans with Disabilities Act, 42 U.S.C. §12131(2). 28 C.F.R. § 35.104. Further, Plaintiffs have an independent "legally cognizable interest in [their children's] education" under IDEA as parents of children with disabilities. *Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 534 (2007) (citing 20 U.S.C. § 1400(c)(5)).  Plaintiffs reside in Texas and their children attend public schools in Texas.

19.     Defendant Texas Education Agency ("TEA") is an agency of the state of Texas.  TEA may be served through the Agency's Commissioner, Defendant Mike Morath, and both Defendants may be served at 1701 North Congress Avenue, Austin, Texas 78701. As Commissioner, Defendant Morath is responsible for the acts and omissions of the TEA, and he is sued in his official capacity. Additionally, TEA is a public entity within the meaning of the Americans with Disabilities Act ("ADA"), 28 C.F.R. § 35.104, and a recipient of federal financial assistance within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section 504"), as amended.

---

[7] Plaintiffs allege that TEA's regulations also violate Title VI of the Civil Rights Act of 1964 ("Title IV"), 42 U.S.C. § 2000d *et seq*., and the Equal Educational Opportunities Act of 1974 ("EEOA"), 20 U.S.C. § 1701 *et seq*. Under Title VI, "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Similarly, the EEOA prohibits a state agency from denying "equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

TEA is also a State Education Agency ("SEA") within the meaning of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1401 *et seq*.

20.     Defendants are also responsible for the promulgation of 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i) (the regulations at issue in this complaint), which were reauthorized on March 5, 2021.  Texas Register, Volume 46, Number 10, Tex. Reg. 1469, effective March 14, 2021.[8]

21.     Plaintiffs—the LEP mothers of disabled students enrolled in independent Texas public school districts—remain subject to and continue to be injured by the effects of the aforementioned regulations as more specifically described *infra*.

## DECLARATORY JUDGMENT

**Standards for Considering Requests for Declaratory Judgment** [9]

22.     The State Office of Administrative Hearings ("SOAH") refuses jurisdiction over claims brought by parents against Defendants for violations of IDEA unless those claims involve TEA's direct provision of services. Consequently, Plaintiffs are barred from seeking relief from Defendants in that forum.  Alternatively, Defendants may assert that state education regulations should be challenged in Travis County District Court rather than through IDEA's mandatory state administrative due process hearing system and/or appeal to federal court. However, in the instant case, Plaintiffs' request for declaratory relief arises from federal law.

23.     Presently, there is no parallel proceeding in a Texas state court of competent jurisdiction. Plaintiffs' complaint concerns an important and ongoing issue arising from TEA's violation of

---

[8] Counsel for Plaintiffs, together with the Southern Center for Child Advocacy, a nonprofit educational advocacy organization, originally brought these concerns to the TEA Commissioner on or about May 13, 2021, by certified and electronic mail.  *See* **ATTACHMENT A.**

[9] 28 U.S.C. § 2201(a).  While the Declaratory Judgment Act is derivative and does not provide an independent cause of action, it creates a form of relief to clarify and settle the legal relations at issue in this cause and to resolve any uncertainty or controversy giving rise to the instant litigation.  *Aetna Life Ins. v. Haworth,* 300 U.S. 227, 240 (1937); *In re B-727 Aircraft*, 272 F.3d 264, 270 (5th Cir. 2001).

IDEA—a comprehensive *federal* statutory and regulatory framework governing the provision of special education and related services to students with disabilities, including a mechanism for ensuring LEP parents knowingly and meaningfully participate in the special education process, as argued more fully below. *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 394 (5th Cir. 2003).

24.     Thus, exercising jurisdiction over Plaintiffs' request for declaratory relief is reasonable and would not constitute a frivolous use of the Court's time and resources. *Public Affairs Assocs. v. Rickover*, 369 U.S. 111, 112 (1962).

25.     Further, because Plaintiffs' right to relief depends on the resolution of a substantial question of federal law, namely, whether the federal *language-normally-used* or the State's *unable-to-speak-English* standard applies to LEP parents in Texas, Plaintiffs respectfully ask that this Court hear their request for declaratory judgment and injunctive relief. *Singh v. Duane Morris LLP*, 538 F.3d 334, 337-38 (5th Cir. 2008).

## CAUSES OF ACTION

### First Cause of Action: Federal Preemption
### The Supremacy Clause versus *The Commissioner's Rules*

26.     The Supremacy Clause of the United States Constitution, and the doctrine of federal preemption that flows from it, requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962)); U.S. CONST. art. VI, cl. 2.

27.     State regulations are preempted when they "[stand] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal statute. *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983).

28.     Preemption also occurs when federal law 'occupies the field,' as it were, or when a state law conflicts with a federal statute.  *Wright v. Allstate Ins.,* 415 F.3d 384, 389 (5th Cir. 2005).

29.     Plaintiffs respectfully assert that the Texas *unable-to-speak-English* standard in 19 TEX. ADMIN. CODE §§ 89.1050 is preempted by the federal *language- normally-used* standard in 20 U.S.C. § 1401(30) and 34 C.F.R. § 300.29.

30.     While at first blush it may appear that the Texas rules provide more access to interpreters and translations for Spanish-speakers than the federal rules, the *unable-to-speak-English* requirement actually has the opposite effect and works to limit access to language assistance services to an extremely and arbitrarily narrow class of non-native speakers.  Put another way, the Texas *unable-to-speak-English* standard interferes with and is an obstacle to achieving the objectives of the federal *native language* protections. As a result, *The Commissioner's Rules* also violate Plaintiffs' constitutional rights to equal protection and equal access, as well as their statutory rights as advocates for their disabled children.

**Second Cause of Action:**
***The Commissioner's Rules* Violate the Fourteenth Amendment**
**By Denying Equal Protection and Equal Access to Language Assistance Services**
**for LEP Parents of Students with Disabilities**

 **A. *The Commissioner's Rules* are ambiguous, overly subjective, arbitrary and confusing.**

31.     Words and phrases in IDEA like *normally* or *used by* should be read in accordance with their "ordinary," "general dictionary" sense rather than some narrower or specialized term of art. *See e.g., Sullivan v. Stroop*, 496 U.S. 478 (1990).  Typically, when a court is asked to determine a question of statutory interpretation, its analysis begins "with the language of the statute." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 450 (2002)).  Additionally, a term's ordinary meaning, technical

meaning, and statutory context may all signal a single interpretation. *See e.g., Taniguchi v. Kan Pacific Saipan, Ltd.,* 566 U.S. 560 (2012).

32.     A strict construction of the *native language* provisions of IDEA (one that adheres to the text of the statute exactly as it is written, i.e., the ordinary and general dictionary interpretation of the phrase "normally used by") creates greater protections for LEP parents than the State's ambiguous and arbitrary *unable-to-speak-English* standard precisely because the Texas standard does not account for degrees of language proficiency.[10]  *United States v. American Trucking Assns.,* 310 U.S. 534, 543 (1940) (overly ambiguous or subjective statutes are invalid); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

33.     Further, a regulation should not create uncertainty. *See e.g. Kisor v. Wilkie,* 139 S. Ct. 2400 (2019). Here, the State's ambiguous and overly subjective *unable-to-speak-English* standard creates uncertainty.  Interestingly, a strict construction of the Texas regulation would result (*and, in the case of the Plaintiff mothers, has resulted*) in the denial of language assistance services to LEP parents who can *technically* speak and understand the English words and phrases necessary to obey work-related commands and meet basic survival needs.[11]

---

[10] While imperfect, the federal standard nonetheless recognizes the need to err on the side of caution by focusing on *the speaker's context* rather than the subjective interpretation of a school administrator deciding whether someone is "unable to speak English" and to what degree.

[11] In addition to being confusing, *The Commissioner's Rules* are also internally inconsistent. For example, in 19 TEX. ADMIN. CODE § 89.1050(h), *The Commissioner's Rules* require prior written notice in the parent's native language without reference to whether the parent is unable to speak English—

> "[W]henever a school district proposes or refuses to initiate or change the identification, evaluation, or educational placement of a student or the provision of a free appropriate public education to the student, the school district must provide prior written notice as required in [IDEA] including providing the notice in the parent's *native language* or other mode of communication" (emphasis added).

The obvious result of § 89.1050(h) is the very real possibility, as in Plaintiffs' case, that an LEP parent may receive *Prior Written Notice* in Spanish for an IEP that is written in English or an IEP Team Meeting (ARD-c) that was conducted only in English or with an interpreter. The fact that this occurs is evidence of the confusing and arbitrary nature of the Texas *unable-to-speak-English* standard.

**B. The regulations at issue must be considered in light of Defendants' duty to translate "vital written materials" for LEP parents pursuant to federal guidance and Title VI.[12]**

34.     Plaintiffs respectfully submit that deference is due [13] to guidance issued by the Department of Justice ("DOJ").  In 2002, DOJ penned guidance regarding the prohibitions in Title VI against national origin discrimination affecting limited English proficient people. As DOJ's 2002 guidance notes, school districts must provide for the translation of "vital written materials" into the language of each "frequently-encountered" group of LEP parents. *DOJ Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455 (June 18, 2002).

35.     This also appears to be the position of the Department of Education. In *Letter to Boswell*, OSERS argued that providing written translations of special education documents, particularly IEPs, is evidence that "a parent has been fully informed of the services his or her child will be receiving."  *Letter to Boswell*, 49 IDELR 196 (OSEP 2007).

36.     In 2016, OSEP issued a *Dear Colleague* letter [14] noting the intersection of Title VI—which prohibits language-based discrimination—and IDEA's *native language* protections:[15]

"Under Title VI, all vital documents, including a student's IEP, must be accessible to LEP parents . . .This is because a parent needs meaningful access to the IEP not just during the IEP

---

[12] Texas recognizes the federal native language definition and has incorporated it into The Commissioner's Rules regarding IDEA Part C (Early Childhood Intervention Services).  *See* 26 TEX. ADMIN. CODE §350.103—

> (30) Native Language--As defined in 34 CFR §303.25.
>     (A) When used with respect to an individual who is limited English proficient (as that term is defined in section 602(18) of the Act), native language means:
>         (i) the language normally used by that individual, or, in the case of a child, the language normally used by the parents of the child [ . . . ]."

[13] *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 468 U.S. 837 (1984).

[14] https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/iep-translation-06-14-2016.pdf.

[15] Plaintiffs acknowledge that there is no private right of action under Title VI based on disparate-impact discrimination but cite Title VI, together with the EEOA, at fn. 7 as part of the larger context regarding the State's responsibilities to LEP parents generally.

meeting, but also across school years to monitor the child's progress and ensure that IEP services are provided."

37.     As alleged above, the Equal Protection Clause[16] guarantees equal access to public education. *The Commissioner's Rules* violate the Equal Protection Clause by arbitrarily limiting access to language assistance services to only a very narrow population of LEP parents of students with disabilities through the use of an overly subjective administrative screening process.

**Third Cause of Action:**
***The Commissioner's Rules* Violate**
**IDEA, ADA and Section 504[17]**

**IDEA's Informed Consent and Meaningful Parental Participation Requirements**

38.     A school district must take reasonable steps to obtain a parent's informed consent before taking important actions like conducting evaluations or amending a student's IEP to add or remove services or to change a child's educational placement. 34 C.F.R. §300.300. Further, any *Prior Written Notice* issued to a parent must comport with the requirements of 34 C.F.R. §300.503(c)—

(c) ***Notice in understandable language.***

(1) The notice required under paragraph (a) of this section must be -

(i) Written in language understandable to the general public; and

(ii) *Provided in the native language of the parent* or other mode of communication used by the parent unless it is clearly not feasible to do so.

(2) If the native language or other mode of communication of the parent is not a written language, the public agency must take steps to ensure -

(i) That the notice is translated orally or by other means to the parent in his or her native language or other mode of communication;

(ii) That the parent understands the content of the notice; and

---

[16] U.S. CONST. amend. XIV, §1. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 30-35 (1973).

[17] Please see ¶s 13-14 *supra*.  The violations of IDEA alleged in this Cause of Action also constitute violations of the disability-discrimination protections and access guarantees of Section 504 and ADA.

(iii) That there is written evidence that the requirements in paragraphs (c)(2)(i) and (ii) of this section have been met" (emphasis added).  *See also* 20 U.S.C. §§ 1415(b)(3) and (4), 1415(c)(1), 1414(b)(1).

39.     In a similar spirit, parents are entitled to the opportunity to meaningfully participate in their children's special education evaluation, planning and IEP development process.  *Buser v. Corpus Christi Indep. Sch. Dist.*, 51 F.3d 490(5ᵗʰ Cir. 1995); *White v. Ascension Parish*, 343 F.3d 373 (5ᵗʰ Cir. 2013); 19 TEX. ADMIN. CODE § 89.1050(e); 34 C.F.R. § 300.503; *Honig v. Doe,* 484 U.S. 305, 311-12, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1987); *Board of Education v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982); 20 U.S.C. § 1415(b)(1)(A), (C), (E), and (2).  A parent is by definition denied the opportunity to meaningfully participate in her child's special education planning if she doesn't understand the language.

40.     IDEA requires *informed consent* as part of its guarantee of meaningful parental participation in the special education process:

"*Consent* means that –

(a) The parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her *native language*, or through another mode of communication;

(b) The parent *understands and agrees in writing* to the carrying out of the activity for which his or her consent is sought [ . . . ]." 34 C.F.R. § 300.9 (emphasis added).

41.     An LEA's obligation to obtain a parent's informed consent includes making certain that the parent is "fully informed of all [relevant] information" in her *native language*.  20 U.S.C. § 1401(30) ("The term *native language*, when used with respect to an individual who is [LEP], means the language normally used by the individual").

**Federal versus State Standards for Access to Meaningful Language Assistance Services**

42.     Pursuant to 34 CFR § 300.322(f), a school district must give a parent a written copy of the student's IEP at no cost.  Consistent with the informed consent requirements cited above, IDEA also mandates that school districts do what it takes to make sure that an LEP parent understands the contents of her child's IEP—

> "(e) *Use of interpreters or other action, as appropriate.* The public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose **native language** is other than English." 34 CFR § 300.322(e)(emphasis added).

This code section, combined with the requirement that an LEP parent be "fully informed of all [relevant] information" in her *native language* [20 U.S.C. § 1401(30)], establishes a significant and broadly applicable safeguard against the sort of misinformation and misunderstanding that would effectively exclude an LEP parent from the process.

43.     Unfortunately and at great expense to LEP parents of children with disabilities in Texas, *The Commissioner's Rules* water down the safeguards by adding a caveat that does not exist in the federal statute—

- "*[i]f the parent is unable to speak English*, the school district must provide the parent with a written notice [for Admission, Review and Dismissal committee ("ARD-c") meeting notices or notices of refusal to convene ARD-c meetings] in the parent's *native language*, unless it is clearly not feasible to do so…" 19 TEX. ADMIN. CODE § 89.1050(f)(emphasis added).

- "*If the student's parent is unable to speak English and the parent's native language is Spanish*, the school district must provide a written copy or audio recording of the student's IEP translated into Spanish. *If the student's parent is unable to speak English and the parent's native language is a language other than Spanish*, the school district must make a good faith effort to provide a written copy or audio recording of the student's IEP translated into the parent's native language." 19 TEX. ADMIN. CODE § 89.1050(i)(emphasis added).

44.     If an LEP parent qualifies under the subjective and arbitrary *unable-to-speak-English* standard, a school district has the option of either giving the parent a written translation of the IEP documents *verbatim* in the parent's *native language* or an audio recording orally translating the entire content of the IEP document. [18]  In addition to capriciously narrowing the number of LEP parents who can receive services using a catch-as-catch-can criteria like the Texas *unable-to-speak-English* standard, *The Commissioner's Rules* also artificially and peremptorily reduce the documents subject to translation and interpretation to audio recordings of ARD-c meetings and IEPs.

### *The Commissioner's* Rules Have Harmed the Named Plaintiff Mothers By Violating Their Rights to Informed Consent and Meaningful Participation in the Special Education Process

45.     Plaintiffs—who speak only enough English to navigate the work-a-day world—represent the epitome of the discriminatory impact these ambiguously phrased and wholly subjective regulations have wrought.  Further, and more importantly, the Plaintiff mothers have been directly injured by *The Commissioner's Rules* as alleged herein and seek declaratory relief from an on-going injury.

---

[18] 19 TEX. ADMIN. CODE § 89.1050(i)(1-2).  A school district can provide an LEP parent with an audio recording of a special education meeting at which the parent was assisted by an interpreter so long as the audio recording provided to the parent contains an oral translation of the *entire content* of the IEP

"(1) For purposes of this subsection, a written copy of the student's IEP translated into Spanish or the parent's native language means that *all of the text in the student's IEP in English is accurately translated into the target language in written form. The IEP translated into the target language must be a comparable rendition of the IEP in English and not a partial translation or summary of the IEP in English.*

(2) For purposes of this subsection, an audio recording of the student's IEP translated into Spanish or the parent's native language means that *all of the content in the student's IEP in English is orally translated into the target language* and recorded with an audio device. A school district is not prohibited from providing the parent with an audio recording of an ARD committee meeting at which the parent was assisted by an interpreter as long as the audio recording provided to the parent contains *an oral translation into the target language of all of the content in the student's IEP in English.*" *Id.* (emphasis added).

46.     The untenable situation created by *The Commissioner's Rules* is this:  If LEP parents can merely speak English, they are not entitled to the regulatory access rights cited above.

47.     For each of the Plaintiffs, application of *The Commissioner's Rules* has thwarted the protections she should have received pursuant to the federal criteria for access to language assistance services, namely, access in her *native language*. In each situation, because the mother spoke just enough English to get by, 19 TEX. ADMIN. CODE § 89.1050, and more precisely the *unable-to-speak-English* standard, has effectively denied her the opportunity to participate in the development of her child's IEP meaningfully and knowingly.  Each parent's situation illustrates the problems inherent in the *unable-to-speak-English* standard when set against the requirement in IDEA that all vital special education documents should be understood and consented to in writing by an LEP parent in her *native language*.

   **(I)     Sra. Garcia and the Problem of the "Translated" Audio Copy**

48.     Throughout her son's special education process, Sra. Garcia has been routinely denied appropriate language assistance services.  Now, her son S.A. is facing the possibility that he will be transferred to another campus to address unresolved behavioral issues.  Had Sra. Garcia been appropriately apprised of her son's educational needs and informed about his disability profile in her *native language* as required by the federal *language-normally-used* standard earlier in her son's special education process, she may have been able advocate effectively for her son.  It was not until the current school year that Sra. Garcia attended an ARD-c meeting with an appropriate advocate.

49.     Prior to receiving assistance from a Spanish-speaking advocate and paralegal, Sra. Garcia was denied a fully translated IEP.  As recently as August 30, 2021,  Sra. Garcia's school district

provided a "translated audio copy," but the entire IEP is not translated as required by TEX. ADMIN. CODE § 89.1050.

50.     Sra. Garcia's son's August 30, 2021 IEP is redacted and attached as **ATTACHMENT B**. The attached IEP is an example of the sort of haphazard and incomplete translations that Sra. Garcia has received over the years.  The IEP is almost entirely in English—the Spanish portions are highlighted in the attachment in yellow or green.

51.     From year-to-year, Sra. Garcia has received untranslated or partially translated copies of the mandatory *Prior Written Notice* documents that are among the "informed consent" safeguards of IDEA.  Compare Sra. Garcia's 2020 and 2021 *Prior Written Notice* redacted and attached as **ATTACHMENT C.**

52.     On information and belief, Sra. Garcia's school district has routinely failed to ensure that she fully understood S.A.'s IEPs in her native language and has cited to *The Commissioner's Rules*, namely that Sra. Garcia is *technically not unable-to-speak-English*,[19] as it were, as justification for its failure to follow IDEA.

### (II)     Sra. Lopez and the Problem of "Other Meetings"

53.     In 2017, at a crucial point in Sra. Lopez's son's special education process, H.M.'s school district convened an ARD-c meeting.  When this vital IEP meeting took place—a meeting to determine whether her son's eligibility as a student with AU should be reconsidered, which would have significant and dispositive impacts on his special education and related services, Sra. Lopez was not afforded a proper interpreter, if even one at all.  The minutes or deliberations from the November 16, 2017 IEP state that an "interpreter was present," but the signature page indicates there was not—

---

[19] The use of potential double negative is unavoidable—much like the confusion created by *The Commissioner's Rules.*



*From page 25 of H.M.'s November 16, 2017 IEP ("XII. SIGNATURE OF ARD/IEP TEAM AND OTHER PARTICIPANTS").*

54.     Similarly, on the signature page where Sra. Lopez would indicate that she was assisted by an interpreter, there is not an interpreter's signature—



*From page 30 of H.M.'s November 16, 2017 IEP ("ARD/IEP SUPPLEMENT: Prior Written Notice").*

55.     The decisions made at this ARD-c meeting laid the foundation for H.M.'s special education and related services, but Sra. Lopez didn't understand what was being discussed nor to what she was being asked to consent.    Her son's evaluation was not translated in Spanish, so she was unable to decipher its meaning.

56.     Fast forward two years and in December of 2019, Sra. Lopez requested what would be considered an Independent Educational Evaluation ("IEE") because H.M.'s behavior was getting worse and she disagreed with the school district's decision to drop H.M.'s AU eligibility.

57.     On information and belief, the school district provided a brief response solely in English.

58.     Unfortunately, the school district did not fully respond (*again solely in English*) to her request for an IEE *until over 300 days later* in the fall of 2020 when the request was reiterated by her Spanish-speaking advocate in an ARD-c meeting the advocate requested on Sra. Lopez's behalf.

59.     Nevertheless, at the time of Sra. Lopez's initial IEE request, H.M.'s AU-related behaviors began to escalate to the extent that an ARD-c meeting was convened as an Manifestation Determination Review ("MDR") committee on March 5, 2020.

60.     School records indicate that a certified or adequately trained interpreter [20] was not present for the MDR, which is conducted by a student's ARD-c and akin to an IEP meeting.

---

[20] A District administrator served as an informal interpreter, but she did not interpret the entirety of the meeting and was often distracted by administrative duties.  The standard set by the Administrative Communications System of U.S. Department of Education in its *Departmental Directive* (Re-certified on November 3, 2017), is as follows—

"**Qualified Translator or Interpreter** – An in-house or contracted translator or interpreter who has demonstrated competence to interpret or translate through court certification or through other professional language skills assessment certification."

**Effective Communication** – Sufficient communication to provide the LEP individual with meaningful access to the services that otherwise are available to the public.  Staff must take reasonable steps to ensure that communication with an LEP individual is as effective as communications with others when providing similar programs and services.

**Interpretation** – The act of listening to a communication in one language (source language) and orally converting it to another language (target language) while retaining the same meaning [. . .]

**Limited English Proficient (LEP)** – Individuals whose primary language is not English and who have limited ability to write, read, speak, or understand English. LEP individuals may be competent in certain types of communication in English (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing). Similarly, LEP designations are context-specific: an individual may possess sufficient English language skills to function in one setting but may find these skills are insufficient in other situations. Note: if an individual identifies him or herself as an LEP individual needing services, the Department typically should accept that designation and provide the appropriate services."

61.     Sra. Lopez has resolved her dispute with H.M.'s school district; however, Defendants are also liable to Sra. Lopez as a result of the limitations and restrictions imposed by *The Commissioner's Rules*.  In other words, but for the standard in 19 TEX. ADMIN. CODE § 89.1050, Sra. Lopez would have been afforded consistent and appropriate language assistance services. Sra. Lopez continues to receive vital general and special education documents only in English and still struggles to obtain appropriate language assistance services at her son's local campus because she can speak and understand English just enough now to assert her rights to those services. Throughout her son's special education process, on information and belief, Sra. Lopez has been informed either implicitly or explicitly over and over again that TEA does not require fully translated IEPs or other comprehensive language assistance services because Sra. Lopez can speak a little English.  Additionally, 34 CFR § 300.322(e) is not limited to IEPs, but includes all vital special education documents. The standards in 19 TEX. ADMIN. CODE § 89.1050 have the effect of justifying, particularly in case of Spanish-speaking parents, the denial of requests for translation of documents other than IEPs and work to limit translation to a narrow subset of special education documents.

    **(III)   Sra. Sanchez and the Problem of the Untranslated Evaluation**

62.     A student's full and individual evaluation for special education and related services is the bedrock upon which the student's IEP is built.

63.     In Texas, school districts can often avoid having to conduct full evaluations by relying on what is termed a REED ("review of existing evaluation data"). For example, if the parent agrees and a student's multidistrict evaluation team or ARD-c does not request additional testing, no

---

https://www2.ed.gov/policy/gen/leg/foia/acsocroco1102.pdf

triennial re-evaluation is required.  REED meetings are often detached from ARD-c meetings to avoid the translation and interpretation requirements.

64.     In order to rely solely on existing evaluation data, the school district must inform a parent that she has the option of requesting a full evaluation.  34 CFR § 300.305(d)(1)(ii).

65.     In Sra. Sanchez's case, her daughter C.S.'s most recent REED was allegedly conducted with a Spanish interpreter on September 23, 2020; however, on information and belief, the interpreter did not interpret the entire REED/Re-evaluation document and did not properly translate throughout the meeting.  Moreover the document is written entirely in English.  There is no translation of this vital document.  There is nothing in the documentation that Sra. Sanchez has received from her school district that memorializes that she was informed in her native language that she was entitled to request a full evaluation instead of merely a REED.  Moreover, the evaluation expressly documents that Sra. Sanchez and C.S. primarily speak Spanish at home. A redacted copy of C.S.'s December 4, 2020 Re-evaluation attached as **ATTACHMENT D.**

66.     Almost a year later, on May 26, 2021, the school district convened an ARD-c meeting for C.S. to develop her IEP for the 2021-2022 school year.  The school district documents reflect that Sra. Sanchez was allegedly assisted by an interpreter and that she received an audio copy of the annual ARD-c meeting.

67.     Nevertheless, the audio recording does not translate C.S.'s IEP in full as Texas regulations require, and the IEP itself is almost entirely in English (with the exception of residual Spanish translation from the previous IEP *a year earlier*).

68.     While the IEP is almost entirely in English, the barebones *Prior Written Notice* from the May 26, 2021 ARD-c meeting is in rudimentary Spanish.  The irony (as well as the problem) is

obvious—Sra. Sanchez received *Prior Written Notice* in Spanish for an IEP that is almost entirely drafted in English.

69.     On information and belief, C.S.'s school district denied Sra. Sanchez the appropriate language assistance services to which she was entitled by federal law as result of *The Commissioner's Rules* cited above.

70.     Now, C.S. is in high school and yet another administrator is tasked with subjectively assessing—in accordance with *The Commissioner's Rules*—whether Sra. Sanchez is unable to speak English.

**CONCLUSION**

While the facts and allegations set forth above are exemplary and not exclusive, the situation in each case illustrates one or more of the problems directly caused by 19 TEX. ADMIN. CODE § 89.1050.  Plaintiffs have all been denied the language assistance services contemplated by 34 CFR § 300.322(e) as a result of *The Commissioner's Rules*.  For each Plaintiff mother, the school district at issue relied on the criteria set out in 19 TEX. ADMIN. CODE § 89.1050 (the Texas *unable-to-speak-English* standard) and limitations it imposes on documents and meetings subject to potential translation and/or interpretation to deny Plaintiffs the language assistance services and other *native language* safeguards guaranteed by IDEA.

**ATTORNEYS' FEES**

Plaintiffs are entitled to and seek an award of their reasonable attorneys' fees, costs, and expenses pursuant to IDEA, ADA/504, and the Declaratory Judgment Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Assume jurisdiction of this Cause;

B.      Declare that 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i) violate Plaintiffs' rights under the Americans with Disabilities Act and Section 504 and are preempted by the Individuals with Disabilities Education Improvement Act (IDEA);

C.      Declare that 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i) violate Plaintiffs' rights to equal protection of the law pursuant to the Fourteenth Amendment;

D.      Issue Preliminary and Permanent Injunctive Relief enjoining Defendants from violating the Americans with Disabilities Act, Section 504, IDEA and the Fourteenth Amendment by enforcing the Texas unable-to-speak-English standard in 19 TEX. ADMIN. CODE §§ 89.1050(f) and (i) and the limitations on documents and meetings subject to interpretation/translation;

E.      Award Plaintiffs their reasonable attorneys' fees, costs, and expenses and grant further relief as just and equitable.

Respectfully submitted,

**HENRY GREEN BOSTWICK PLLC**
PO Box 1348
Manchaca, Texas 78652-1348
greenbostwick.com
southerncenterforchildadvocacy.org
(833) 426-5529
(866) 335-0534 (*eFax*)
**DIRECT CELL:  540-314-3192**

BY:  */s/ Henry Green Bostwick II*
Henry Green Bostwick II
hank@hgbpllc.com
Texas State Bar # 24099415
**ATTORNEY FOR PLAINTIFFS**

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing has been served upon the Texas Education Agency on November 10, 2021.

TEXAS EDUCATION AGENCY
COMMISSIONER MIKE MORATH          Via Email: christopher.jones@tea.texas.gov
1701 N. Congress Ave.
Austin, Texas 78701

/s/ Henry Green Bostwick II /s/
HENRY GREEN BOSTWICK II