# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **MARIA GARCIA, SANDRA LOPEZ,** | § | |
| **and NORMA SANCHEZ,** | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | **Case No. 1:21-CV-01011-RP** |
| | § | |
| **MIKE MORATH, in his official** | § | |
| **capacity as the COMMISSIONER of** | § | |
| **the TEXAS EDUCATION AGENCY,** | § | |
| **and TEXAS EDUCATION AGENCY,** | § | |
| *Defendants* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

### TO: THE HONORABLE ROBERT PITMAN
### UNITED STATES DISTRICT JUDGE

Before the Court are the State Defendants' Motion to Dismiss, filed March 1, 2022 (Dkt. 4); Plaintiffs' Response to Defendants' Motion to Dismiss, filed April 1, 2022 (Dkt. 7); and Defendants' Reply, filed April 8, 2022 (Dkt. 8). On April 4, 2022, the District Court by Text Order referred the Motion to the undersigned Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

## I.     Background

Plaintiffs Maria Garcia, Sandra Lopez, and Norma Sanchez are Spanish speakers whose minor disabled children attend public school in Texas and receive special education services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. Plaintiffs are "limited English proficient," in that they speak "little to no English" and know "just enough English to get by." *Id.* ¶¶ 2, 6. Plaintiffs allege that they have been denied "appropriate translation and

interpretation services depriving each mother of the information she needed to make fully informed decisions about, and to meaningfully participate in, the special education process for her child." *Id.* ¶ 5. Defendants now move to dismiss Plaintiffs' claims.

## A. The IDEA

Congress enacted the IDEA to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living," and that "the rights of children with disabilities and parents of such children are protected." 20 U.S.C. §§ 1400(d)(1)(A)-(B)). Under the IDEA, the federal government "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.,* 137 S. Ct. 743, 748 (2017). "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.* at 748-49 (quoting §§ 1401(9), (26), (29)). An "individualized education program," called an IEP, serves as the "primary vehicle" for providing each child with the promised FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988). "Crafted by a child's 'IEP Team'—a group of school officials, teachers, and parents—the IEP spells out a personalized plan to meet all of the child's 'educational needs.'" *Fry*, 137 S. Ct. at 748 (quoting §§ 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)).

"The IDEA is frequently described as a model of cooperative federalism. It leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, but imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (cleaned up). For

example, the statute mandates cooperation and reporting between state and federal educational authorities. Participating States must certify to the Secretary of Education that they have "policies and procedures" that will effectively meet the Act's conditions. § 1412(a). State educational agencies, in turn, must ensure that local schools and teachers are meeting the State's educational standards. §§ 1412(a)(11), 1412(a)(15)(A). Local educational agencies (school boards or other administrative bodies) can receive IDEA funds only if they certify to a state educational agency that they are acting in accordance with the State's policies and procedures. § 1413(a)(1).

The Supreme Court has stated that the "core of the statute . . . is the cooperative process that it establishes between parents and schools." *Schaffer*, 546 U.S. at 53. The "IDEA requires school districts to develop an IEP for each child with a disability, see §§ 1412(a)(4), 1414(d), with parents playing 'a significant role' in this process." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007) (quoting *Schaffer*, 546 U.S. at 53).

> Parents serve as members of the team that develops the IEP.
> § 1414(d)(1)(B). The "concerns" parents have "for enhancing the
> education of their child" must be considered by the team.
> § 1414(d)(3)(A)(ii). IDEA accords parents additional protections that
> apply throughout the IEP process. See, *e.g.*, § 1414(d)(4)(A) (requiring
> the IEP Team to revise the IEP when appropriate to address certain
> information provided by the parents); § 1414(e) (requiring States to
> "ensure that the parents of [a child with a disability] are members of
> any group that makes decisions on the educational placement of their
> child"). The statute also sets up general procedural safeguards that
> protect the informed involvement of parents in the development of an
> education for their child. See, *e.g.*, § 1415(a) (requiring States to
> "establish and maintain procedures . . . to ensure that children with
> disabilities and their parents are guaranteed procedural safeguards with
> respect to the provision of a free appropriate public education"); §
> 1415(b)(1) (mandating that States provide an opportunity for parents to
> examine all relevant records). See generally §§ 1414, 1415. A central
> purpose of the parental protections is to facilitate the provision of a
> "'free appropriate public education,'" § 1401(9), which must be made
> available to the child "in conformity with the [IEP]," § 1401(9)(D).

*Winkelman*, 550 U.S. at 524-25.

In addition, and relevant here, state and local agencies "must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34 C.F.R. § 300.322(e). "The term 'native language', when used with respect to an individual who is limited English proficient, means the language normally used by the individual or, in the case of a child, *the language normally used by the parents* of the child." § 1401(20) (emphasis added).

## B.  Role of the State under the IDEA

Because the state of Texas receives federal education funding, all school districts within its borders must comply with the IDEA. *J.B. b/n/f Lauren B. v. Frisco Indep. Sch. Dist.*, 528 F. Supp. 3d 614, 634 (E.D. Tex. 2021). The Texas Legislature has mandated that the Texas Education Agency (TEA) "develop, and modify as necessary, a statewide design, consistent with federal law, for the delivery of services to children with disabilities in this state." Tex. Educ. Code Ann. § 29.001. The statewide design must include "rules for the administration and funding of the special education program so that a free appropriate public education is available to all of those children between the ages of three and 21." *Id.* Section 29.001 "echoes the Federal Act by requiring that TEA's rules ensure disabled students a free and appropriate public education by means of an individualized education program." *Texas Advocates Supporting Kids with Disabilities v. Texas Educ. Agency*, 112 S.W.3d 234, 239 (Tex. App.—Austin 2003, no pet.).

The "[TEA] Commissioner's Rules Concerning Special Education Services" are codified in Title 19 of the Texas Administrative Code. 19 Tex. Admin. Code Ann. §§ 89.1001-89.1197. Under § 89.1050(a): "Each school district must establish an admission, review, and dismissal ('ARD') committee for each eligible student with a disability and for each student for whom a full individual and initial evaluation is conducted pursuant to § 89.1011 of this title (relating to Full

Individual and Initial Evaluation)." The school district also is "responsible for all of the functions for which the IEP team is responsible under federal law and regulations and for which the ARD committee is responsible under state law." *Id.* School districts must

> take steps to ensure that one or both parents are present at each ARD committee meeting or are afforded the opportunity to participate, including notifying the parents of the meeting early enough to ensure that they will have an opportunity to attend and scheduling the meeting at a mutually agreed upon time and place.

§ 89.1050(d). "If the parent is unable to speak English, the school district must provide the parent with a written notice required under subsection (d) or (e)(2) of this section in the parent's native language, unless it is clearly not feasible to do so." § 89.1050(f).

## C. Plaintiffs' Claims

Plaintiffs bring this action against Defendants TEA and TEA Commissioner Mike Morath, alleging violations of their rights under the IDEA, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act.[1] Plaintiffs contend that the unable to speak English requirement in § 89.1050(f) means that a limited English proficient (LEP) parent in Texas is provided language and translation assistance services only if she is unable to speak any English whatsoever, but if – like Plaintiffs – an LEP parent speaks a few words of English, she "may be denied many or all of those services." Dkt. 1 ¶ 7. Plaintiffs also seek a declaratory judgment that the unable to speak English standard in § 89.1050(f) is preempted by the federal "language normally used by the parents" or "native language" standard under the IDEA, 20 U.S.C. § 1401(20) and 34 C.F.R. § 300.322(e). Complaint, Dkt. 1 ¶ 29.[2]

---

[1] Plaintiffs also allege claims under the Fourteenth Amendment to the United States Constitution, but concede in their Response that they have failed to allege a plausible Fourteenth Amendment claim. Dkt. 7 at 5 n.2. The Court recommends that this claim be dismissed.

[2] Plaintiffs cite the wrong sections of the statute and regulations in their Complaint. *See, e.g.*, Dkt. 1 ¶¶ 6, 29 (citing to "20 U.S.C. §1401(30)" and "34 C.F.R. § 300.29").

## II.    Analysis

Defendants contend that Plaintiffs lack standing and so move to dismiss this action under Rule 12(b)(1) for lack of jurisdiction. Alternatively, Defendants move to dismiss under Rule 12(b)(6), arguing that § 89.1050 is not preempted by federal law and, alternatively, that Plaintiffs fail to state a plausible claim for relief.

When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Ramming*, 281 F.3d at 161. This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice. *Id.* Accordingly, the Court addresses Defendants' standing argument first.

### A.  Rule 12(b)(1)

A Rule 12(b)(1) motion to dismiss challenges the subject matter jurisdiction of the court. "Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 307 (5th Cir. 2021).

In ruling on a Rule 12(b)(1) motion, the court may consider: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The court's dismissal of a plaintiff's case for lack of subject matter jurisdiction is not a determination of the merits and does not prevent

the plaintiff from pursuing a claim in a court that does have proper jurisdiction. *Id.* "A motion to dismiss for lack of subject-matter jurisdiction should only be granted if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *In re FEMA*, 668 F.3d at 287.

## B. Standing

The Constitution limits federal courts to deciding "Cases" and "Controversies." Art. III, § 2. "Among other things, that limitation requires a plaintiff to have standing." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022). "The requisite elements of Article III standing are well established: A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The party invoking federal jurisdiction bears the burden of establishing these elements. *Lujan*, 504 U.S. at 561.

Defendants do not dispute that Plaintiffs have established an injury in fact, that is, that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. Rather, Defendants contend that Plaintiffs have failed to establish the second and third elements of standing: traceability and redressability.

### 1. Traceability

Plaintiffs allege that their children's school districts failed to provide translation and interpretation services necessary for them to meaningfully participate in, and make fully informed decisions about, the special education services provided to their children, as required by the IDEA. Plaintiffs assert that these failures and deprivations were caused by the regulations promulgated by the TEA and the TEA Commissioner. Defendants argue Plaintiffs have failed to show that their injuries are traceable to the TEA because "the TEA does not conduct the communications with the

parents, nor does it promulgate any rule preventing the school districts from communicating with parents in their native language." Dkt. 4 at 4.

The traceability requirement "does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011) (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). "After all, the standard is that the injury be *fairly* traceable to the challenged conduct, not definitively so." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 368 (5th Cir. 2020). In *Bennett*, the Supreme Court warned against "wrongly equat[ing] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." 520 U.S. at 168-69. Although "it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169.

State agencies that receive assistance under the IDEA  "must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate." 20 U.S.C. § 1415(b); 34 C.F.R. § 300.322. In addition, those agencies "must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34 C.F.R. § 300.322(e). The Texas Legislature has mandated that the TEA promulgate rules for the administration and funding of the special education program so that a FAPE is available to all eligible disabled children. TEX. EDUC. CODE ANN. § 29.001.

The Fifth Circuit has expressly found that "either or both" the TEA and local school districts "may be held liable for the failure to provide a free appropriate public education." *St. Tammany Par. Sch. Bd. v. State of La.*, 142 F.3d 776, 784 (5th Cir. 1998). In *St. Tammany*, the court reasoned that the "IDEA places primary responsibility on the state educational agency, by providing that it 'shall be responsible for assuring that the requirements of this subchapter are carried out.'" *Id.* (quoting 20 U.S.C. § 1412(6)).

> This language suggests that, ultimately, it is the [state educational agency]'s responsibility to ensure that each child within its jurisdiction is provided a free appropriate public education. Therefore, it seems clear that [a state educational agency] may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented.

*Id.* (quoting *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 952 (4th Cir. 1997)); *see also Wood v. Katy Indep. Sch. Dist.*, Civil Action No. H-09-1390, 2011 WL 4383032, at *4 (S.D. Tex. Sept. 20, 2011) ("A state educational agency may be held liable for failure to provide a FAPE under IDEA."). Under the IDEA, the TEA is responsible for "providing a FAPE, addressing failures to provide appropriate services and taking corrective action to address the needs of the child." *John H. ex rel. Denise H. v. Elgin Indep. Sch. Dist.*, No. 1:20-CV-816-LY, 2021 WL 7081436, at *5 (W.D. Tex. Oct. 25, 2021) (internal quotations omitted), *R. & R. adopted*, 2021 WL 7081435 (W.D. Tex. Dec. 8, 2021).

Because Plaintiffs allege that the TEA's rules caused the school districts to deny Plaintiffs' rights under the IDEA and the TEA is responsible for promulgating rules that implement and enforce the procedural requirements under the IDEA, Plaintiffs have alleged sufficient facts to show that their injuries are "fairly traceable" to the Defendants. *See id.* (finding that because the TEA is tasked with providing a FAPE under the IDEA and plaintiff alleged that the TEA denied him a FAPE, plaintiff demonstrated that his alleged injuries "are fairly traceable and likely

redressable by a favorable ruling requiring the State Defendants to take the necessary steps to ensure that Elgin ISD provides him with a FAPE").

### 2. Redressability

To satisfy the redressability element of standing, Plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Lujan*, 504 U.S. at 561). Defendants argue that Plaintiffs fail to show that Defendants can redress Plaintiffs' alleged injuries because "Plaintiffs have pled no facts that, if TEA's rules matched verbatim the language of the federal rules, the LEAs [Local Education Agencies] would comply and provide appropriate translation and interpretation services." Dkt. 4 at 6.

The Court is not persuaded by this argument. The TEA, not the school district, is responsible for promulgating rules implementing and enforcing the IDEA. TEX. EDUC. CODE ANN. § 29.001. Both the TEA and school districts, moreover, are responsible and liable for taking "whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34 C.F.R. § 300.322(e). Therefore, Plaintiff has alleged sufficient facts at the motion to dismiss stage to demonstrate redressability. *See John H.*, 2021 WL 7081436, at *5 (holding that plaintiff demonstrated redressability against the TEA).

### 3. Conclusion as to Standing

Having concluded that Plaintiffs have satisfied the requirements for standing, the undersigned Magistrate Judge recommends that Defendants' Motion to Dismiss Plaintiffs' IDEA claims under Rule 12(b)(1) should be denied.

## C.  Exhaustion of Administrative Remedies

Before a plaintiff may bring an action in federal court for a violation of the IDEA, she must seek recourse from the administrative procedures established by the statute. 20 U.S.C. § 1415(i)(2); *Gardner v. Sch. Bd. Caddo Par.*, 958 F.2d 108, 111 (5th Cir. 1992). Although Plaintiffs state in their Complaint that they have not exhausted their administrative remedies,[3] Defendants do not move for dismissal on this basis. Yet if exhaustion under the IDEA is jurisdictional, the Court would be required to address the exhaustion issue *sua sponte*. *See Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001) ("[F]ederal courts must address jurisdictional questions whenever they are raised and must consider jurisdiction *sua sponte* if not raised by the parties."). Accordingly, the Court must address whether exhaustion under the IDEA is jurisdictional before proceeding to the merits of the case.

The Fifth Circuit has not yet determined whether exhaustion under the IDEA is a jurisdictional requirement or a claim-processing requirement that can be forfeited. *See Logan v. Morris Jeff Cmty. Sch.*, No. 21-30258, 2021 WL 4451980, at *2 (5th Cir. Sept. 28, 2021) (per curiam) (stating that "we have not yet decided whether a failure to exhaust under IDEA deprives courts of subject matter jurisdiction or is instead a claim-processing requirement which could be forfeited by the party seeking to assert it"); *T. B. ex rel. Bell v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1051 n.2 (5th Cir. 2020) ("This circuit has not yet determined whether exhaustion under the IDEA is a jurisdictional requirement."); *Gardner*, 958 F.2d at 112 ("We do not decide whether exhaustion is a jurisdictional requirement.").[4] The Fifth Circuit has implied, however, that exhaustion is not

---

[3] Dkt. 1 ¶ 17.

[4] The circuit courts of appeals are split as to whether the IDEA's exhaustion requirement is jurisdictional or is a claim-processing rule. *See Valentin-Marrero v. Puerto Rico*, 29 F.4th 45, 53 n.4 (1st Cir. 2022) (collecting cases).

jurisdictional. *See Bell*, 980 F.3d at 1047 n.2 ("We note, however, that the Supreme Court has recently held that Title VII's administrative exhaustion requirement is not jurisdictional but is, instead, a mandatory claim-processing rule.") (citing *Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 1851 (2019)); *Gardner*, 958 F.2d at 112 ("Quite arguably, [exhaustion under the IDEA) is not [a jurisdictional requirement] because there is a judicial exception to exhaustion when exhaustion would be futile or inadequate.").

Assuming without deciding that exhaustion under the IDEA is jurisdictional, on the facts of this case, the Court finds that Plaintiffs' failure to exhaust is not fatal to their claims because exhaustion would have been futile. The Supreme Court has recognized that although judicial review is not normally available until administrative proceedings have been exhausted, "parents may by-pass the administrative process where exhaustion would be futile or inadequate." *Honig*, 484 U.S. 305, 327 (1988). To show futility, "a plaintiff must demonstrate that adequate remedies are not reasonably available or that the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process." *M.L. v. Frisco Indep. Sch. Dist.*, 451 F. App'x 424, 428 (5th Cir. 2011) (quoting *Coleman v. Newbaugh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007)). Exhaustion may be excused as futile where there is a "systematic violation" or a "hearing officer would have been powerless to correct the alleged IDEA violation." *Papania-Jones v. Dupree*, 275 F. App'x 301, 304 (5th Cir. 2008). Futility also may be shown where "an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002).

In this case, Plaintiffs challenge a TEA Rule, and the hearing officer and TEA would have been bound by that rule. The Court does not lack jurisdiction based on Plaintiffs' failure to exhaust administrative remedies.

### D.  Preemption

Plaintiffs allege that the state's use of the unable to speak English standard set out in

§ 89.1050(f) violates their rights under the IDEA and is preempted by the IDEA and 34 C.F.R.

§ 300.322(e). Defendants argue that Plaintiffs' preemption claim fails because the Supremacy

Clause "is not a source of any federal rights" and make the conclusory assertion that "Plaintiffs

have failed to show the federal rule preempts the TEA Rule." Dkt. 4 at 7, 9.[5]

The Supremacy Clause of the United States Constitution states:

> This Constitution, and the Laws of the United States which shall be
> made in Pursuance thereof; and all Treaties made, or which shall be
> made, under the Authority of the United States, shall be the supreme
> Law of the Land; and the Judges in every State shall be bound
> thereby, any Thing in the Constitution or Laws of any State to the
> Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2. The doctrine of federal preemption arising out of the Supremacy Clause

requires that "any state law, however clearly within a State's acknowledged power, which

interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666 (1962);

*see also United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016) ("Under the doctrine of federal

preemption, a federal law supersedes or supplants an inconsistent state law or regulation."). The

court's "ultimate task in any pre-emption case is to determine whether state regulation is consistent

with the structure and purpose of the statute as a whole." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,

505 U.S. 88, 98 (1992).

The Supreme Court has recognized three distinct types of preemption: express, field, and

conflict. *Zadeh*, 820 F.3d at 751 (citing *Gade*, 505 U.S. at 98). Here, Plaintiffs rely on the conflict

theory of preemption. Conflict preemption takes two forms: (1) when compliance with both state

---

[5] In their Reply, Defendants contend that Plaintiffs have abandoned their preemption argument "by not
opposing Defendant's motion to dismiss it." Dkt. 8 at 3. Plaintiffs clearly have not abandoned their
preemption argument. Dkt. 7 at 7.

and federal law is impossible, and (2) when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).[6]

In their First Cause of Action, Plaintiffs assert a federal preemption claim based on the Supremacy Clause. Dkt. 1 at 9. Defendants argue that Plaintiffs' preemption claim fails because the Supremacy Clause "does not create any causes of action." Dkt. 4 at 7. Defendants are correct that the Supremacy Clause is not a "source of any federal rights" and "does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 324 (2015). Instead, the Supremacy Clause is a rule of decision: "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325.

While Plaintiffs improperly allege preemption as a separate claim, they are not relying on the Supremacy Clause as a source of their rights. Rather, Plaintiffs rely on their rights under the IDEA to argue that § 89.1050(f) is preempted by federal law. The IDEA grants parents "independent, enforceable rights" that "encompass the entitlement to a free appropriate public education for the parents' child." *Winkelman*, 550 U.S. at 533. Accordingly, the Court construes Plaintiffs' preemption argument as asserted under the IDEA. Plaintiffs allege that the IDEA's native language standard preempts § 89.1050(f), and that the Texas unable to speak English standard "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Dkt. 7 at 7 (quoting *Pac. Gas & Elec.*, 461 U.S. at 203).

---

[6] Express preemption requires Congress to explicitly state its intent to preempt relevant state laws. *Zadeh*, 820 F.3d at 751. Field preemption occurs when Congress intends to "occupy the field," taking over a field of law to the exclusion of state or local authority. *Id.* (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983)).

"The goals of IDEA include 'ensur[ing] that all children with disabilities have available to them a free appropriate public education' and 'ensur[ing] that the rights of children with disabilities and parents of such children are protected.'" *Winkelman*, 550 U.S. at 523 (quoting §§ 1400(d)(1)(A)-(B)). The IDEA, "through its text and structure, creates in parents an independent stake not only in the procedures and costs implicated by this process but also in the substantive decisions to be made." *Id.* at 531. Therefore, the "IDEA does not differentiate, through isolated references to various procedures and remedies, between the rights accorded to children and the rights accorded to parents." *Id.*

As stated above, the IDEA requires state and local agencies to establish and maintain numerous procedural safeguards "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." § 1415(a). "The IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program." *Winkelman*, 550 U.S. at 530. Parents must be given an opportunity "to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child." § 1415(b)(1). In addition, each agency "shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." § 1414(e). State and local agencies also must "take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34 C.F.R. § 300.322(e).

The Court finds that the IDEA's native language standard protects "the informed involvement of parents in the development of an education for their child," *Winkelman*, 550 U.S. at 524, and ensures that LEP parents "understand[ ] the proceedings of the IEP Team meeting." 34 C.F.R. § 300.322(e). In contrast, Plaintiffs allege that the Texas unable to speak English standard fails to ensure that all parents of limited English proficiency understand the IEP proceedings because some such parents who, like Plaintiffs, speak a few words of English but lack proficiency are not entitled to any translation or interpretive services in their native language. Thus, these parents are denied some of the procedural safeguards of the IDEA enacted to ensure that parents are fully informed of and involved in the IEP process and the provision of a FAPE to their disabled child.

The Court finds that Plaintiffs have stated a claim that the Texas unable to speak English standard in § 89.1050(f) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the IDEA. *Hines*, 312 U.S. at 67 (1941). Thus, Plaintiffs have stated a plausible argument that § 89.1050(f) of the Texas Administrative Code is preempted by 34 C.F.R. § 300.322(e) and violates Plaintiffs' rights under the IDEA.

### E.  ADA and Rehabilitation Act Claims

In addition to asserting violations of their rights under the IDEA, Plaintiffs also allege violations of the ADA and Section 504 of the Rehabilitation Act. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Similarly, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132. Courts apply the same analysis to claims under Section 504 and Title II of the ADA. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010); *Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).

In order to show a violation of either the Rehabilitation Act or the ADA, a plaintiff must allege that (1) she has a qualifying disability; (2) she is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) such discrimination is by reason of her disability. *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 690 (5th Cir. 2017). A plaintiff can recover monetary damages under either statute only if she also proves that the discrimination was intentional. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020); *see also Delano-Pyle*, 302 F.3d at 574 ("A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination.").

Plaintiffs allege no claims on behalf of their children under the ADA or Rehabilitation Act; nor do they allege that they themselves have qualifying disabilities. Moreover, Plaintiffs concede in their Response "that there are no facts sufficient to prove intentional discrimination on the part of Defendants." Dkt. 7 at 5 n.2. Accordingly, Plaintiffs have failed to state plausible claims for relief under the ADA and the Rehabilitation Act, and those claims should be dismissed.

### III.    Recommendation

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that Defendants' Motion to Dismiss (Dkt. 4) is **GRANTED IN PART AND DENIED IN PART**. The Court **RECOMMENDS** that the District Court **GRANT** the Motion to Dismiss Plaintiffs' claims under the ADA, the Rehabilitation Act, and the Fourteenth Amendment and dismiss those claims with prejudice, but **DENY** the Motion as to Plaintiffs' claims under the IDEA and their request for declaratory relief that § 89.1050(f) of the Texas Administrative Code is preempted by the IDEA.

It is **FURTHER ORDERED** that this case be **REMOVED** from the undersigned Magistrate Judge's docket and **RETURNED** to the docket of the Honorable Robert Pitman.

### IV.      Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on August 29, 2022.


_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

18